IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BENNY A. ESPINOZA, | ) | No. C 07-1741 JSW (PR) |
| Petitioner, | ) ) ) | **ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |
| v. | ) ) | |
| J. WALKER, Warden, | ) ) | |
| Respondent. | ) ) | |

## INTRODUCTION

Benny A. Espinoza, a prisoner of the State of California currently incarcerated at the California State Prison-Sacramento in Represa, California, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition"), challenging the constitutional validity of his state conviction. This Court ordered Respondent to show cause why the petition should not be granted. Respondent filed an answer, a memorandum of points and authorities in support thereof, and exhibits. Petitioner filed a traverse. This order denies the petition for a writ of habeas corpus on the merits.

## PROCEDURAL BACKGROUND

Petitioner was convicted of murder after a jury trial in Santa Clara County Superior Court. Petition at 2, 3. He was sentenced to a term of twenty-six years to life in state prison on July 15, 2005. *Id.* at 2.

Petitioner appealed his conviction to the California Court of Appeal, Fourth District, which affirmed the conviction in an unpublished, reasoned opinion filed November 9, 2006. Respondent's Answer ("Answer") Ex. A (*People v. Espinoza*, No.

H029172, 2006 WL 3240047 (Cal. Ct. App. Nov. 9, 2006)) at 1.  The California Supreme Court denied review on January 17, 2007.  Answer Ex. E.  On March 27, 2007, Petitioner filed the instant petition.

## **FACTUAL BACKGROUND**

The facts underlying the charged offenses, as found by the California Court of Appeal, are as follows:

> At about 7:30 a.m. on January 27, 2004, defendant was riding the bus on his way to work at Jiffy Lube when Samuel Pena boarded the bus.  Defendant was wearing a red sweatshirt or jacket.  Red is the color of the Norteno street gang.  Defendant also had Norteno street gang tattoos on his hands.  Pena, a Willow Glen High School student, was wearing a blue shirt and jeans and a blue belt.  Blue is the color of the Sureno street gang.  Pena was a member of Varrio Gramercy Locos, a Sureno street gang.  According to a gang expert, there is hatred and violence between the two gangs.
>
> Pena sat across the aisle from defendant.  They proceeded to "mad-dog" or "mean-mug" each other, that is, they stared each other down with mean or hard looks.  Several students heard an argument between defendant and Pena.  Defendant asked, "You got beef with me?" About three to five minutes later, defendant asked, "Where are you going? Because I got to go to work." Pena replied that he was going to school.  Defendant took out his knife and showed it to Pena.  As Pena got off the bus, he turned back to defendant and said, "Let's take this outside." Defendant nodded and said, "I'm not going to take this from this guy." Defendant then exited the bus.
>
> Several students testified that they saw defendant get off the bus after Pena, bump into someone, drop a knife, pick up the knife, and rush toward Pena.  They also testified that Pena, who was unarmed, was taking off his jacket or backpack when defendant stabbed him multiple times.
>
> Antonio Campos testified that he saw Pena throw his hands in the air as defendant approached, as if to say, "What's going to happen?" or, "What's going on?" The gang expert described this gesture as an invitation to fight.  As Pena was making this gesture, Campos did not see the knife in defendant's hand and did not see him take it out.  However, as defendant went up to Pena, defendant already had his knife out.  Though defendant may have first hit Pena with his fist, or he may have first hit Pena with the knife, he had his knife out and in his hand when he first struck Pena.  According to Campos, Pena did not have a knife, and was trying to block defendant's blows.
>
> Pena tried to defend himself by putting his hands up and pushing defendant away.  When Pena went down on his knees, defendant

2

> continued to stab him. Pena died of multiple stab wounds to the neck, head, chest, and back. The wound to the neck was quickly fatal, while the other wounds were potentially survivable.
>
> Pena's blood was found on the blade of a knife. Defendant's blood was found on the handle. After the attack, defendant had abrasions on his hand and a cut on his finger that required suturing. It is common for an assailant to have wounds on his hand from the blade of his own knife when the weapon does not have a hand guard.
>
> The defense case was based on the testimony of Jesus Sepulveda, another Willow Glen student. While Sepulveda was riding the bus to school, he saw Pena mean-mugging defendant and heard defendant call Pena a "scrap," a derogatory term for a Sureno. Defendant also said, "You're lucky I'm going to work, but we can still handle this ." When Pena reached his stop, he said, "This is my stop. We can get off." Defendant responded, "What are you still staring at?"
>
> According to Sepulveda, defendant exited the bus after Pena. Defendant had a knife in his hand as he followed Pena. At trial, Sepulveda testified that Pena did not have a knife in his hand. However, at the preliminary hearing, Sepulveda testified that defendant swung first with his fist, and that Pena swung at defendant with a knife, cutting his hand. After Sepulveda testified at the preliminary hearing, he told a detective that Pena had a knife. At trial, Sepulveda stated that his preliminary hearing testimony was untrue. He explained that he was "just thinking of other situations, and I wasn't sure about what I was seeing."
>
> Sepulveda also testified at trial that he had told a police officer a couple hours after the incident that Pena had a knife. The prosecutor gave Sepulveda a transcript of his interview with the detective on the day of the stabbing. After reviewing it, Sepulveda was unable to find where he had told the detective that Pena had a knife. On redirect examination, defense counsel had Sepulveda read a portion of the transcript of his interview with the detective. It stated: "The one with the red jacket just started running towards him. But the one that went to our school, he didn't know that he was running towards him already. Then he turned around, and then he-he got his knife, and then tried to stab him in the face." At trial, Sepulveda explained that Pena was the one who turned around, and defendant was the one who got his knife and tried to stab Pena in the face.

Answer Ex. A at 1-4 (footnote omitted).

## **STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28

3

U.S.C. § 2254(a). A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark*, 331 F.3d at 1069.

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the

1  highest state court to address the merits of the Petitioner's claim in a reasoned decision.
2  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

3  In his petition for a writ of habeas corpus, Petitioner asserts a single claim for
4  relief: the trial court violated Petitioner's right to a fair trial under the Fifth, Sixth and
5  Fourteenth Amendments by failing to provide, *sua sponte*, a particular jury instruction on
6  self-defense. Petition at 11-12.

## DISCUSSION

Petitioner claims that the trial court violated his constitutional right to due process and a fair trial by failing to *sua sponte* provide the jury with two optional paragraphs of instructions from CALJIC Nos. 5-54 and 5-56. Under California law, where there is evidence that a defendant's adversary responded with sudden and deadly force to a simple assault, these optional paragraphs provide an exception to the standard rule that a defendant must first retreat or decline combat in order to invoke a claim of self-defense. Answer Ex. A at 5, *citing People v. Quach*, 116 Cal. App. 4th 294, 302-03 (2004).

The instructions requested by Petitioner were formulated after the Court of Appeal's decision in *Quach*, which held that an exception exists to the general rule that there must be evidence that the defendant attempted to retreat from combat and notified the other combatant of his retreat in order to invoke the defense of self-defense. 116 Cal. App. 4th at 302-303. The exception to the withdrawal and notification rule "applies when there is evidence that the defendant's adversary responded with a sudden and deadly counterattack and there was no time to decline further fighting or retreat." Answer Ex. A at 5, *citing Quach*, 116 Cal. App. 4th at 302-03. Following *Quach*, the CALJIC instructions were revised to include an optional paragraph regarding this exception to the withdrawal and notification rule. Answer Ex. A at 5.

Specifically, Petitioner contends that the trial court improperly failed to *sua sponte* instruct the jury that 1) "[i]f the victim of simple assault responds in a sudden and deadly

5

1  counterassault, the original aggressor need not attempt to withdraw and may use
2  reasonably necessary force in self-defense" (CALJIC 5.54) and 2) "[i]f the other party to
3  the mutual combat responds in a sudden and deadly counterassault, that is, force that is
4  excessive under the circumstance, the party victimized by the sudden excessive force
5  need not attempt to withdraw and may use reasonably necessary force in self-defense"
6  (CALJIC 5.56).  Answer Ex. A at 5.

### A. Legal Standard

The Due Process Clause of the Fourteenth Amendment requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  Therefore, a criminal defendant is entitled to adequate jury instructions on the defense theory of the case.  *See, e.g., Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (as amended) (error to deny defendant's request for instruction on simple kidnapping where such instruction was supported by the evidence); *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (failure to give instruction on exception to special circumstance felony murder violated defendant's due process right to present complete defense).

But due process does not require that an instruction be given unless the evidence supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611-12 (1982) (holding that a lesser included offense instruction need not be given unless the evidence would support convicting on the lesser offense and acquitting on the greater offense).  "[A] state trial court's finding that the evidence does not support a claim [] is entitled to a presumption of correctness on federal habeas review." *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (citing *Hartman v. Summers*, 120 F.3d 157, 161 (9th Cir. 1997)).

"A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding.  The error must so infect the entire trial that the defendant was deprived of his right to a fair trial guaranteed by the due process

6

clause of the fourteenth amendment." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 2006). Furthermore, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). The "burden is especially heavy" for a habeas petitioner whose claim involves a failure to give a particular instruction. *Id.* If a court finds a constitutional error, it must then determine whether the error had a substantial and injurious effect or influence on the jury's verdict before granting habeas relief. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam), *citing Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

**B.     Analysis**

The state Court of Appeal gave the following background for Petitioner's jury instruction claim:

> Defendant acknowledges that much of the testimony established that defendant approached Pena with a knife and that Pena never had a knife. He claims, however, that the testimony of Campos and Sepulveda presented an alternate scenario in which Pena pulled a knife as defendant approached to engage in a fistfight. Thus, defendant argues that the trial court was required to instruct the jury that if it determined that Pena responded in a sudden and deadly counterassault, then he did not need to withdraw before he had the right to use necessary force in self-defense.
>
> Campos's testimony does not support defendant's interpretation that defendant "approached to engage in a fistfight." When Pena threw his hands in the air, Campos did not see the knife in defendant's hand and did not see him take it out. However, as defendant went up to Pena, defendant already had his knife out. Though defendant may have first hit Pena with his fist, or he may have first hit Pena with the knife, he had his knife out and in his hand when he first struck Pena. According to Campos, Pena did not have a knife, and was trying to block defendant's blows. Thus, when defendant walked up to Pena with his knife drawn for the purpose of combat, he committed an assault with a deadly weapon, regardless of whether he first struck Pena with the knife or his fist. Since Campos did not describe a simple assault by defendant, Pena could not escalate the violence and thereby justify defendant's use of a deadly weapon in self-defense.
>
> Sepulveda's testimony also does not support defendant's position. Defendant relies on Sepulveda's preliminary hearing testimony that defendant swung first with his fist, and that Pena swung at defendant with a knife, cutting his hand. However, Sepulveda also testified that defendant had his knife out when he got off the bus and ran

> toward Pena. Even assuming that there was substantial evidence that Pena had a knife, the exception to the notification and withdrawal rule would not apply. When defendant ran towards Pena with a knife, he committed an assault with a deadly weapon. Thus, there was no evidence that defendant committed a simple assault that Pena escalated. Accordingly, the trial court did not err in its instructions on self-defense.

Answer Ex. A at 5-6 (citations omitted).

The Court of Appeal held that the evidence presented at trial showed Petitioner approached his victim holding a knife and, as a result, he committed assault with a deadly weapon rather than a simple assault. Therefore, Petitioner was not entitled to the instruction because defendant's use of a deadly weapon was not brought on by Pena's actions. Petitioner was not entitled to the instruction because his initial actions did not constitute a simple assault. Answer Ex. A at 6. The appellate court noted Petitioner's argument that there was evidence, through the testimony of Campos and Sepulveda, that Pena escalated the violence by trying to stab defendant with a knife and thus the optional jury instructions should have been given. *Id.* at 5-6. But, regardless of conflicting testimony about whether or not Pena held a knife and whether or not Petitioner first swung his fists before using a knife, all percipient witnesses at trial, including Campos and Sepulveda, testified that Petitioner approached Pena holding a knife. *Id.*

In support of Petitioner's argument that the jury should have been instructed on the exception to the withdrawal and notification rule, he relies on the *Quach* defense. In *Quach*, trial testimony concerning whether or not the defendant was fired upon before he drew his gun was not unanimous. There was testimony that a rival gang member escalated the initial confrontation by pulling or firing a gun, provoking Quach to respond. *Quach*, 116 Cal. App. 4th at 303. Other testimony indicated that Quach was fired on before he took out his own pistol. *Id.* The court of appeal in that case held that "[h]e was entitled to an instruction that would have enabled the jury to render a verdict in accordance with such facts." *Id.* The Court of Appeal found under the facts of *Quach*

1   that it was error for the trial court not to instruct the jury concerning an exception for self-
2   defense in the face of a "sudden and perilous" counterassault that permits no opportunity
3   for retreat. *Id.* at 302-303.

4   Here, however, testimony at trial was unanimous that Petitioner approached Pena
5   holding a knife. Campos testified that, although he did not initially see a knife, when he
6   looked again he saw Petitioner with a knife in his hand as he first struck at Pena. Answer
7   Ex. C (trial transcript) at 169:6-26. Likewise, regardless of conflicting testimony over
8   whether or not Pena ever had a knife, Sepulveda consistently testified that Petitioner had
9   his knife out as he approached Pena. *Id.* at 277:25-278:10; 288:22-28; 289:8-10:290:7-
10  14.

11  Petitioner, holding a knife as he approached Pena, assaulted Pena with a deadly
12  weapon and so the facts did not justify inclusion of the optional self-defense instructions
13  concerning sudden and deadly force under California law. *People v. Raviart*, 93 Cal.
14  App. 4th 258, 263-64 (2001) (defendant who drew his weapon and was in a position to
15  use it committed assault on investigating officers). Since Petitioner did not commit a
16  simple assault, Pena could not have escalated Petitioner's attack with a sudden and deadly
17  counterassault. Therefore, the *Quach* exception did not apply, and the trial court did not
18  err in its failure to *sua sponte* issue such a jury instruction.

19  Although the appellate court specifically held that the facts in evidence at trial did
20  not support a defense theory of escalation from simple assault when it affirmed the trial
21  court's judgment (Answer Ex. A at 6), it did not directly address the alternate theory of
22  sudden and deadly force arising from mutual combat. Nonetheless, the evidence is
23  likewise conclusive on this point, because there was no testimony from any witness,
24  including Campos and Sepulveda, that Petitioner only resorted to his knife in self-defense
25  after Pena escalated their mutual combat with sudden and deadly force. Instead, all
26  witnesses at trial testified that Petitioner approached Pena holding a knife. Answer Ex. C

9

at 169:6-26 (Campos); 277:25-278:10, 288:22-28, 289:8-10:290:7-14 (Sepulveda); 67:23-68:19 (Borillos); 98:24-99:9, 100:7-17 (Guatemala); 117:28-119:18 (M. Roldan); 143:5-146:5 (A. Roldan); 219:20-220:25 (Torres). Accordingly, when the appellate court held that the trial court did not err by failing to give the optional jury instructions, it did not unreasonably apply federal law, because the facts in evidence do not support a finding of self-defense in response to sudden and deadly force on either a theory of simple assault or a theory of mutual combat.

Under the presumption of correctness given to a state court's determination that the evidence does not support a particular jury instruction, the Court of Appeal's holding was not an unreasonable application of federal law nor an unreasonable determination of the facts presented at trial. *See Menendez*, 422 F.3d at 1029; 28 U.S.C. § 2254(e)(1). Petitioner received adequate instructions on the defense theory of the case, including various instructions on self-defense, and was in no way prohibited from "present[ing] a complete defense." *Trombetta*, 467 U.S. at 485; *see* Answer Ex. C at 436:9-440:16. Petitioner cannot meet his "especially heavy" burden of showing that he was deprived of a fair trial, and therefore is not entitled to habeas relief on this claim. *Henderson*, 431 U.S. at 155.

## CONCLUSION

After a careful review of the record and pertinent law, the petition for writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: November 2, 2009

_____
JEFFREY S. WHITE
United States District Judge

10